Gregory CLARK and Linda Meashey, individually and on behalf of others similarly situated, Appellants,

v.

PFIZER INC., and Warner–Lambert Company, LLC, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 18, 2009.

Filed Jan. 19, 2010.

Reargument Denied March 24, 2010.

John K. Westop, Jenkintown, for appellants.

Robert C. Heim, Philadelphia, for appellees.

BEFORE: STEVENS, GANTMAN and ALLEN, JJ.

OPINION BY ALLEN, J.:

¶ 1 Gregory Clark and Linda Meashey, individually and on behalf of others similarly situated ("Appellants"), appeal from the trial court's February 9, 2009 order decertifying the class action and granting partial summary judgment in favor of Pfizer Inc. and Warner–Lambert Company, LLC ("Defendants"). We affirm the trial court's order to the extent that it decertified the class, concluding that Appellants

cannot satisfy the commonality and typicality requirements because individual issues of reliance and/or causation predominated the class' claims. We vacate the trial court's order insofar as it granted summary judgment against the class and/or their claims, concluding that the potential res judicata effect on the absent class members could forever bar their causes of action. Accordingly, we affirm in part and vacate in part.

¶ 2 On June 29, 2007, Appellants commenced this action on behalf of themselves and all other consumers who purchased the prescription drug Neurontin (or generic Gabapentin) for "off-label" uses that were not approved by the Food and Drug Administration ("FDA"). Defendants are the manufacturers and distributors of Neurontin. In 1993, the FDA approved Neurontin for treatment of partial seizures in adults, and in 2002, for management of post-herpetic neuralgia. These are the only two conditions/uses for which the FDA approved Neurontin. Physicians, however, are free to prescribe medication for any condition that they believe to be appropriate even if the medication was not approved by the FDA for that specific condition and/or use. This is known as "off label" prescribing and although permissible in the medical profession, federal law prohibits a drug manufacturer from promoting off-label uses of an FDA-approved medication.

■ ¶ 3 Appellants alleged that beginning in 1995, Defendants deliberately and unlawfully promoted Neurontin to physicians for off-label uses for which the effectiveness had not been scientifically demonstrated. Appellants averred that Defendants engaged in a marketing scheme intended to convince the medical profession that Neurontin was effective for off-label uses, including the treatment of psychiatric disorders, pain syndromes, reflex sympathetic dystrophy, restless leg syndrome, fibromyalgia, anxiety disorder and migraine headaches. Appellants argued that Defendants accomplished this goal by soliciting anecdotal articles for insertion in medical journals, paying "opinion leader" physicians who prescribed Neurontin for off-label uses, and sponsoring medical education conferences which were actually paid promotional events. According to Appellants, Defendants had sales representatives ask doctors during details if they used other anti-epileptic drugs for painful neuropathies and also created internal objectives, strategies and tactics designed to increase sales of Neurontin for off-label uses. In addition, Appellants contended that Defendants promoted the prescription of Neurontin above the maximum doses approved by the FDA. In 2004, the United States Government charged Defendants with two counts of violating the Food, Drug and Cosmetics Act (the "FDCA"). Defendants pled guilty to two counts of unlawful marketing in violation of the FDCA and agreed to pay a $240 million fine.[1]

¶ 4 In their complaint, Appellants asserted common law claims for misrepresentation, negligence, negligence *per se*, and breach of express warranty.[2] On June

---

1. While off-label marketing is illegal, there is no private right of action to enforce it. *In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 92 n. 6 (D.Mass.2007). Rather, a plaintiff must base his/her cause of action through some other recognized legal claim. *See id.*

2. Appellants also claimed that Defendants violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCL"). 73 P.S. § 201–1 *et seq.* However, two years before the trial court certified the class, on March 9, 2005, Appellants and Defendants entered into a stipulation agreeing to dismiss this count from the complaint. R.R. at 111–

29, 2007, the trial court granted Appellants' motion for class certification. The trial court, *inter alia,* found that Appellants demonstrated the requirements necessary to sustain a class action: *i.e.,* that the class was so numerous that joinder of all members would be impracticable; that questions of law or fact were common to the class; and that the class parties' claims and defenses were typical of the entire class. Trial Court Opinion, 6/29/06, at 11–18. Regarding the legal element of causation, the trial court found that the report of Dr. Meredith Rosenthal, an Assistant Professor of Health, Economics and Policy at the Harvard School of Public Health, sufficed to prove "a fraud upon the entire medical community of the country." *Id.* at 17. In her report, Dr. Rosenthal concluded that Defendants' unlawful conduct "would likely have resulted in impact" to the class members as "a large body of economic theory and empirical evidence suggests that pharmaceutical company marketing activities increase [prescriptions of Neurontin for off-label use.]" *Id.*

¶ 5 On October 23, 2007, the parties agreed to define the certified class as follows: "All individuals who were residents of Pennsylvania as of November 1, 2007 and who purchased Neurontin or its generic equivalent Gabapentin in the Commonwealth of Pennsylvania primarily for personal family or household purposes from 1995 to the present other than for treatment of partial seizures associated with epilepsy (as adjunctive therapy) or for management of post-herpetic neuralgia (pain associated with herpes zoster rash outbreaks)." Appellants then provided notice to the class members, informing them of the class action and their rights to opt out of the class.

¶ 6 Following further discovery, Defendants, on June 13, 2008, filed a motion to decertify the class. In that motion, Defendants argued that the class should be decertified because recent evidence showed that Neurontin can be (and has been) effective in treating class members for many off-label conditions. Defendants also sought decertification on the ground that numerous doctors who prescribed Neurontin to class members for off-label uses did so for reasons wholly unrelated to any misrepresentation made by Defendants. In light of this evidence, Defendants argued that class certification was improper because Appellants could not establish, through common proof, that the individual class members suffered an injury, or that the prescribing doctors relied upon a false advertisement that caused an injury. In addition, Defendants filed a motion for summary judgment, contending that Appellants failed to adduce sufficient evidence in support of their class claims, and/or that the class claims failed as a matter of law.

¶ 7 By order dated February 9, 2009, the trial court granted partial summary judgment in favor of Defendants "on [Appellants'] class claims for breach of warranty." Trial Court Opinion (T.C.O.), 4/17/09, at 5. The trial court found that there was "no evidence that [Appellants] saw, heard or in any way received any warranties that Neurontin could be used in circumstances not approved by the FDA." *Id.* The trial court also granted summary judgment against the class as to all members "who actually benefited from off label use of Neurontin." *Id.* at 5–6. The trial court found that the evidence revealed that some class members actually received a benefit from off-label use of Neurontin, and thus,

13. In the stipulation, Appellants preserved their rights to appeal all issues related to the

dismissal of their UTPCL claim. *Id.*

these class members suffered no cognizable legal injury. *Id.* In all other respects, the trial court denied Defendants' motion for summary judgment, allowing the case to proceed on the class claims of misrepresentation, negligence and negligence *per se.*

¶ 8 In its February 9, 2009 order, the trial court additionally granted Defendant's motion to decertify the class. The trial court reasoned:

Since some class members have benefited from the use of Neurontin and other class members have not benefited, individual questions of fact are presented making the case unsuitable for class resolution. Individual questions of fact exist as to each class member to determine whether their off-label prescription of Neurontin was beneficial. Whether an individual class member suffered a compensable loss is an inherently individualized question which predominates making class resolution impracticable and possibly impossible.

*Id.* at 9. The trial court did not address Defendants' alternative argument that the class action could not be maintained because individual questions of reliance and/or causation permeated the liability inquiry.

¶ 9 Appellants now appeal from the trial court's February 9, 2009 order, raising the following issues for review:

A. MAY A CLASS ACTION BE DECERTIFIED AFTER THE COURT HAS ENTERED PARTIAL SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFFS' CLAIMS?

B. MAY A CLASS ACTION BE DECERTIFIED IF NO SUBSTANTIAL CHANGE IN FACTS OR LAW HAS OCCURRED SINCE CERTIFICATION WAS FIRST GRANTED?

C. WAS DECERTIFICATION BASED UPON AN ERRONEOUS FACTUAL CONCLUSION AND A MISAPPLICATION OF LAW?

D. WAS THE FEBRUARY 9, 2009 SUMMARY JUDGMENT ENTERED IN VIOLATION OF *NANTY–GLO* AND RULE 1035.2?

E. DID THE TRIAL COURT ERR IN ENTERING SUMMARY JUDGMENT ON PLAINTIFF'S CONSUMER PROTECTION CLAIM?

F. DID THE TRIAL COURT ERR IN ENTERING PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFFS WHO PURCHASED THE GENERIC VERSION OF NEURONTIN FROM THIRD PARTY MANUFACTURERS?

Brief for Appellants at 8.

■ ¶ 10 For ease of disposition, we first address Appellants' claim that the trial court erred in decertifying the class.[3] In their brief, Appellants point to the expert testimony of Dr. Rosenthal, and conclude that at least 93% of the class members, through their physicians, relied upon Defendants' misrepresentations in prescribing Neurontin for off-label use. Appellants suggest that Dr. Rosenthal's testimony was sufficient proof that uniformly established, or, ostensibly, permitted a presumption regarding, the causation and

---

**3.** As an order denying class certification is appealable under the collateral order doctrine, *Dunn v. Allegheny County Prop. Assessment Appeals & Review,* 794 A.2d 416 (Pa. Cmwlth.2002); *Hanson v. Fed. Signal Corp.,* 451 Pa.Super. 260, 679 A.2d 785, 788 (1996), we conclude that the trial court's order, to the extent that it decertifies the class action, is appealable.

reliance elements of the class' claims. We disagree.

■ ¶ 11 In Pennsylvania, trial courts are vested with broad discretion in deciding whether to certify a class action. *Debbs v. Chrysler Corp.*, 810 A.2d 137, 154 (Pa.Super.2002). We will not disturb an order denying class certification on appeal unless the trial court neglected to consider the requirements of the rules or abused its discretion in applying them. *Id.*

¶ 12 Pa.R.C.P. 1702 governs class actions in Pennsylvania and states, in pertinent part:

One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709 and;

(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Pa.R.C.P. 1702; *see* Pa.R.C.P. 1708 and 1709.

■ ¶ 13 "At a class certification hearing, the burden of proof lies with the proponent; however, since the hearing is akin to a preliminary hearing, it is not a heavy burden." *Debbs*, 810 A.2d at 153. "The proponent need only present evidence sufficient to make out a prima facie case from which the court can conclude that the five class certification requirements are met." *Id.* at 153–54. "This will suffice unless the class opponent comes forward with contrary evidence; if there is an actual conflict on an essential fact, the proponent bears the risk of non-persuasion." *Id.* at 154.

■ ¶ 14 At issue in this case are the second and third prerequisites for class certification—whether "there are questions of law and fact common to the class" and whether the "claims or defenses [of the parties] are typical of the claims or defenses of the class." Pa.R.C.P. 1702(2)-(3). Common questions of law and fact will generally exist if the class members' legal grievances are directly traceable to the same practice or course of conduct on the part of the class opponent. *See Janicik v. Prudential Ins. Co.*, 305 Pa.Super. 120, 451 A.2d 451, 457 (1982). "The common question of fact [requirement] means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all. This is what gives the class action its legal viability." *Allegheny County Housing Authority v. Berry*, 338 Pa.Super. 338, 487 A.2d 995, 997 (1985). "While the existence of individual questions of fact is not necessarily fatal, it is essential that there be a *predominance* of common issues, shared by all the class members, which can be justly resolved in a single proceeding." *Weismer v. Beech–Nut Nutrition Corp.*, 419 Pa.Super. 403, 615 A.2d 428, 431 (1992) (emphasis in original).

■ ¶ 15 The typicality requirement is similar to the requirements of commonality and the adequacy of representation. *Janicik*, 451 A.2d at 457. "The purpose of the typicality inquiry is to determine whether the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of

the proposed class members." *Id.* Where there exists various intervening and possibly superseding causes of the damage, liability cannot be determined on a class-wide basis because individual issues would predominate issues of fact and law that are common to the class and the representatives of the class. *See Weismer,* 615 A.2d at 431.

¶ 16 Here, Dr. Rosenthal's report described "a series of econometric models, each of which [were] used to estimate the causal effect of the allegedly illegal promotion on quantities sold of Neurontin." R.R. at 448. Dr. Rosenthal incorporated the data outlined in her study of Neurontin in the federal multi-district litigation, and stated that adjustments in the analytical model may be necessary to account for differences in Neurontin purchases in Pennsylvania as compared to the nation as a whole. *Id.* at 449. Essentially, Dr. Rosenthal created a "time-series regression model" that mathematically calculated the total quantity of prescribed Neurontin as being equal to assorted "time-variant factors," plus Defendants' "spending on promotional activities," plus "the coefficients that measure the casual effect of off-label promotional events and/or spending on prescription behavior." *Id.* at 448–49.

Utilizing these principles, Dr. Rosenthal concluded that Defendants' conduct "would likely have resulted in impact and economic harm to the Pennsylvania class." *Id.* at 450. During her deposition testimony, Dr. Rosenthal conceded that she did not consult—or review the testimony of—doctors in Pennsylvania to determine whether they relied upon Defendants' misrepresentations to prescribe Neurontin to class members for off-label uses. *Id.* at 1722–23.

■ ¶ 17 In *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.,* 257 F.R.D. 315 (D.Mass.2009), the District Court of Massachusetts assessed the viability of Dr. Rosenthal's statistical model and denied the plaintiffs' motion to certify a class action. The court first explained that the class plaintiffs were not entitled to a presumption of causation, noting that the "fraud-on-the-market theory" has been confined to misrepresentations made in cases involving securities or product price inflation. *Id.* at 326–27.[4]

The court then determined that Dr. Rosenthal's report was inadequate to establish reliance and/or causation on a class-wide basis.

¶ 18 In *In re Neurontin,* the defendants rebutted Dr. Rosenthal's expert re-

---

**4.** The fraud on the market theory is a judicially created presumption typically employed by plaintiffs in securities class actions to prove the reliance element of a section 10(b) and rule 10b–5 securities fraud claim under the Securities Exchange Act of 1934. *Basic, Inc. v. Levinson,* 485 U.S. 224, 241–245, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In such a case, a plaintiff is presumed to have relied on material information disseminated to the public due to market efficiency and the notion that the price of the security simultaneously reflects the incorrect information as it is made public; thus, because traders in a public market rely on the market price and the integrity of the market, the traders have ipso facto relied on the misinformation because they would have traded at another price, or not at all, had the

truth been known. *Id.* at 241–42, 246, 108 S.Ct. 978. Borrowing, implicitly or explicitly, from the fraud on the market theory, courts have allowed plaintiffs to use aggregate, statistical proof to establish class-wide causation in consumer fraud cases alleging artificial price inflation. *In re Neurontin,* 257 F.R.D. at 323. In these cases, "every member of the putative classes was necessarily injured because defendants' alleged fraudulent marketing caused an increase in a product's price, meaning everyone who purchased the product paid too much." *Id.* Consequently, the plaintiffs were automatically subjected to a single source of harm, *i.e.* the effect of the defendant's conduct on the purchase price, and could recover economic damages arising from the fraudulently-inflated price.

port by adducing or pointing to evidence that tended to demonstrate that it was entirely feasible for doctors to prescribe Neurontin for off-label use in the absence of defendants' misrepresentations. The defendants argued that in such a case, the doctor would not have relied on the defendants' statements in prescribing Neurontin, nor could the statements have contributed to the class plaintiffs' injuries; hence, the class plaintiffs could not establish the essential elements of their claims through a single means of common proof. The court found merit in defendants' contentions. On the other hand, the court rejected the plaintiffs' suggestion that statistical evidence could replace traditional proof that the class members, on an individual basis, relied on defendants' misrepresentation and defendants' misrepresentations caused their injury. *Id.* at 324–25. The court found that Dr. Rosenthal's expert report posed "serious questions ... regarding individual doctor's exposure to defendants' misrepresentations *and* the causal nexus between those misrepresentations and plaintiffs' injuries." *Id.* at 326 (emphasis in original). Because Dr. Rosenthal's statistical evidence did not account for "millions of disparate and varied human interactions that resulted in off-label prescriptions for Neurontin," the court concluded that individual issues of law and fact outweighed any issues common to the class. *Id.* As such, the court denied the plaintiffs' motion to certify the class.

■ ¶ 19 In this case, Appellants, acting on behalf of the class, asserted claims for misrepresentation, negligence, negligence *per se,* and breach of express warranty. The instant action is analogous to *In re Neurontin,* and, consequently, does not involve price inflation or an efficient market. *Id.* at 324. Rather, Appellants' theory of liability concerns Defendants' conduct in actively promoting a drug that allegedly had no beneficial effects/purposes aside from its FDA-approved uses. Accordingly, the presumption of reliance and/or causation is inapplicable because Defendants' made an affirmative misrepresentation, and Appellants' claim is not one for securities fraud or artificial price inflation. *See, e.g., In re Neurontin,* 257 F.R.D. at 327 (collecting cases) ("That courts have been uniformly hostile to attempts to extend the fraud-on-the-market theory to consumer fraud cases is not a new development in the case law."); *Kelley v. Microsoft Corp.,* 2009 WL 973368, at *7, 2009 U.S. Dist. LEXIS 35590, at **18–23 (W.D.Wash.2009) (stating that where a presumption of reliance has been extended to the consumer fraud context, it has been limited to cases that primarily allege omissions of fact because in this context, it is "virtually impossible to prove reliance."); *Picus v. Wal–Mart Stores, Inc.,* 256 F.R.D. 651, 659–60 (D.Nev.2009); *Garcia v. Medved Chevrolet, Inc.,* —— P.3d ——, ——, 2009 WL 3765481, at *10, 2009 Colo. App. LEXIS 1882, at **24–26 (Colo.App. 2009) ("We are also persuaded by a variety of state cases that have similarly rejected the invitation to apply a fraud on the market theory to presume reliance and causation in common law fraud or statutory deceit lawsuits."); *Hunt v. United States Tobacco Co.,* 538 F.3d 217, 227–28 (3d Cir. 2008); *Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.,* 365 N.J.Super. 520, 839 A.2d 942, 956–65 (N.J.Super.Ct. Law Div.2003). Given these circumstances, we conclude that despite Dr. Rosenthal's expert report, Appellants were not entitled to a presumption of reliance/causation on their claims of misrepresentation, negligence, negligence *per se,* and breach of express warranty.[5]

5. In *Wiener v. Dannon Co.,* 255 F.R.D. 658,

669 (C.D.Cal.2009), the federal district court,

¶ 20 Since Appellants have no presumption of reliance and/or causation under the law, they were required to prove reliance and/or causation on a class-wide basis in order to succeed on their claims. *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889–90 (1994) (misrepresentation); *Jeter v. Brown & Williamson Tobacco Corp.*, 294 F.Supp.2d 681, 687 (W.D.Pa.2003) (express warranty); *Congini ex rel. Congini v. Portersville Valve Co.*, 504 Pa. 157, 470 A.2d 515, 518 n. 4 (1983) (negligence/negligence *per se*). If a plaintiff can prove reliance and/or causation in an individual action with the same evidence offered to show class-wide reliance and/or causation, then the issue is one of law and fact common to the class. *Henry Schein v. Stromboe*, 102 S.W.3d 675, 694 (Tex.2002).

¶ 21 Here, like the plaintiffs in *In re Neurontin*, Appellants rely on Dr. Rosenthal's statistical proof to establish class-wide causation and reliance. Similar to *In re Neurontin*, Defendants have adduced evidence to prove that doctors in Pennsylvania have prescribed off-label use of Neurontin to class members for reasons wholly unrelated to Defendants' alleged fraudulent marketing. Consequently, in order to establish reliance and/or causation, Appellants "would have to demonstrate doctor-by-doctor that defendants' fraudulent misrepresentations or omissions during the off-label promotion caused the doctor to prescribe the medicine." *Id.* at 331. Professor Rosenthal's statistical analysis cannot fulfill these requirements because it

"does not take into account any other factors that may have led doctors to prescribe Neurontin for off-label indications." *Id.* at 330. Indeed, Dr. Rosenthal presupposes what information doctors in Pennsylvania relied upon in prescribing Neurontin, and Dr. Rosenthal's expert opinion is not based on the prescribing habits of any particular doctor(s) in Pennsylvania. Rather, Dr. Rosenthal's model is grounded in behavioral economics and is premised upon a direct correlation between the expenditures on Neurontin promotion and the number of prescriptions written for the drug. Therefore, "[w]hile in the aggregate Professor Rosenthal's report has some surface appeal, the record in this case demonstrates why the use of spending on fraudulent off-label [uses] as a means to ascertain the number of prescriptions subject to the fraud is flawed." *Id.* at 330. Due to its failure to consider the actual prescribing choices of the class members' doctors, Professor Rosenthal's report is inadequate to show reliance and/or causation for any individual class member, let alone for every member on a class-wide basis.

¶ 22 In sum, statistical probability does not substitute for actual inquiry, as a general showing of percentages does not tend to prove that the class members' specific doctors relied upon Defendants' statements or that Defendants' statements were the proximate cause of an injury. These individualized questions of law and fact, in turn, would substantially predominate those that are common to

applying California state law, allowed a presumption of reliance to stand where the defendant's misrepresentations regarding the clinically proven health benefits of the products were prominently displayed on all of the products' packaging materials. The court reasoned that "[b]ecause, by definition, every member of the class must have bought one of the Products and, thus, seen the packaging, Plaintiffs have succeeded in showing that *the*

*alleged misrepresentations were made to all class members.*" *Id.* (emphasis added). In contrast to *Wiener*, Dr. Rosenthal's expert report, by concession, does not account for all of the class members and fails to establish that the doctors of each and every class member were subjected to Defendants' misrepresentations. As such, *Wiener* is factually inapposite and unpersuasive authority.

the entire class or Appellants Gregory Clark and Linda Meashey as the class' representatives. Therefore, in light of this record, Appellants, as a matter of law, have not carried their burden of demonstrating the commonalty and typicality requirements necessary to sustain a class action under Pa.R.C.P. 1702. The trial court, accordingly, did not commit reversible err in granting Defendants' motion to decertify the class. *See Matjastic v. Quantum Pharmics, Ltd.*, 1991 WL 238304, at **6–7, 1991 U.S. Dist. Lexis 15224, at **19–20 (E.D.Pa. 1991) (denying class certification on claims of fraud, negligent misrepresentation, negligence, and breach of warranties because there were "substantial individual questions of reliance and causation."); *Oshana v. Coca–Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D.Ill.2005); *see also Weismer*, 615 A.2d at 431 (denying class certification where there were "various possible intervening or superseding causes" of nursing bottle syndrome—*e.g.*, prolonged use of a nursing bottle or individual feeding practices); *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200, 234–35 (2000) (finding class certification inappropriate where class members would have to individually prove reliance on defendant's alleged misrepresentations). On this basis, we affirm the portion of trial court's order decertifying the class. *Nationwide Mut. Ins. Co. v. Fleming*, 924 A.2d 1259, 1269 n. 5 (Pa.Super.2007) (stating that this Court may affirm the trial court's ruling on an alternative ground not relied upon by the trial court).[6]

¶ 23 Appellants next argue that the trial court erred in decertifying the class, when in the same order, the trial court also granted partial summary judgment in favor of Defendants. Appellants contend that the trial court is divested of authority to decertify a class once it rendered a decision on the merits of the class' claims. We cannot agree.

¶ 24 To support their assertion, Appellants rely on the plain language of Pa. R.C.P. 1710(d), which states:

> (d) An order under this rule may be conditional and, **before a decision on the merits,** may be revoked, altered or amended by the court on its own motion or on the motion of any party. Any such supplemental order shall be accompanied by a memorandum of the reasons therefor.

*Id.* (emphasis added).

¶ 25 In *Basile v. H & R Block, Inc.*, 973 A.2d 417, 421 (Pa.2009), a majority of our Supreme Court stated:

> Pursuant to Rule 1710(d), a class action can be decertified at anytime "before a decision on the merits." Pa.R.C.P. 1710(d). The Superior Court interpreted "before a decision on the merits" in Rule 1710(d) to mean that Block was required to challenge the class certification prior to the trial court's ruling on the motion for summary judgment on the issue of breach of fiduciary duty. While this interpretation is generally correct, it does not apply here where the Superior Court had earlier reversed the grant of summary judgment and remanded the matter to the trial court for further proceedings. Once that happened, there was no "decision on the merits" and the trial court was permit-

---

**6.** We decline to affirm the trial court's order on the ground that some of the class members have not suffered a compensable injury, *see* T.C.O., 4/17/09, at 9, because this issue is inexorably intertwined with the issue of dam-

ages, and "[i]t is well-established that questions as to the amount of individual damages do not preclude a class action." *Cambanis v. Nationwide Ins. Co.*, 348 Pa.Super. 41, 501 A.2d 635, 640 (1985).

ted to revoke the class certification upon Block's motion.

*Id.* (some citations and footnotes omitted).

¶ 26 While a majority in *Basile* noted the "general rule" of Pa.R.C.P. 1710(d), there has been a long-standing exception to this rule, permitting a trial court to reassess class certification when changed circumstances arise. *See, e.g., Farmers Ins. Exch. v. Benzing,* 206 P.3d 812 (Colo. 2009) ("Generally, we agree that trial courts should not consider decertification without the discovery of new facts or changes in the law or positions of the parties."); *Rivera v. Veterans Mem'l Med. Ctr.,* 262 Conn. 730, 818 A.2d 731, 738 (2003) (stating that "a class once certified on the basis of the requirements of [the class action rules] should be decertified only where it is clear there exist changed circumstances making continued class action treatment improper."); *Key v. Jewel Cos.,* 176 Ill.App.3d 91, 125 Ill.Dec. 652, 530 N.E.2d 1061, 1066 (1988) (stating that a court could alter a certification order after a decision on the merits "where warranted by more complete discovery."). In interpreting language identical to Pa. R.C.P. 1710(d), the United States Court of Appeals for the Third Circuit has held that this exception holds true even when a trial court first renders a decision during the summary judgment phase in favor of the defendant and then decides to decertify the class action. *Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998) (decertifying class after summary judgment); *see Fireside Bank v. Superior Court,* 40 Cal.4th 1069, 56 Cal.Rptr.3d 861, 155 P.3d 268, 276 (2007) ("Before judgment, a class should be decertified 'only where it is clear there exist changed circumstances making continued class action treatment improper.' A fortiori, a similar showing must be made to warrant decertification after a decision on the merits."); *Janicik,* 451 A.2d at 455 ("The court may

alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied."). As noted by Justice Saylor in his concurring opinion in *Basile,* "it would be untenable to force a court to maintain class treatment if, for example, it became apparent after certification that the class was unmanageable." 973 A.2d at 425 n. 6 (Saylor, J. concurring).

¶ 27 We find the above case law persuasive and conclude that the trial court was not prohibited from reconsidering its previous certification order when additional evidence obtained during discovery questioned the viability of the class. In this case, after the trial court certified the class, Defendants discovered and produced the deposition testimony of various doctors to establish that Neurontin was prescribed for reasons other than Defendants' misrepresentations. This evidence constituted the changed circumstances necessary to empower a trial court to revisit its prior certification order, as it called into question the feasibility and manageability of the class. *Benzing, supra; Rivera, supra; Key supra.* We further conclude that reconsideration of class status is appropriate where, as here, the trial court enters partial summary judgment in favor of the class' claims. *Barnes, supra; Fireside Bank, supra.* As such, we find no merit in Appellants' argument that the trial court lacked the authority to revisit its certification order.

¶ 28 Alternatively, even if the trial court technically erred under Pa.R.C.P. 1017(d), this error would be harmless at worst. For reasons discussed more fully below, our decision vacates the portion of the trial court's order that ruled on the substantive merits of the class' claims. Therefore, our decision effectively nullifies the trial court's "decision on the merits," and the

trial court's decertification order, on remand, will stand alone without any ruling on the merits of the class' claims. *See Basile,* 973 A.2d at 421 (stating that there was no decision on the merits for purposes of Pa.R.C.P. 1710(d) when the Superior Court reversed the grant of summary judgment on appeal). Accordingly, assuming that the trial court did err, Appellants would still not be entitled to relief based upon the circumstances of this case and our disposition.

 ¶ 29 Having affirmed the trial court's decision to decertify the class, we now address Appellants' contentions regarding the trial court's grant of partial summary judgment against the class members and/or their claims. As an initial matter, we must determine whether this aspect of the trial court's order is an appealable, interlocutory order.

 ¶ 30 An interlocutory order may be reviewable if it satisfies the requirements of the collateral order doctrine. The collateral order doctrine authorizes an interlocutory appeal only from "an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa. R.A.P. 313(b).

¶ 31 Appellants argue that the rights of the absent class members may be irreparably lost because the trial court entered partial summary judgment against them and then decertified the class, essentially splitting the class' cause of action. Appellants suggest that the absent class members may be forever barred from asserting their claims individually because a judgment has already been entered against them. Additionally, Appellants contend that the class members will be unable to appeal the trial court's ruling after final judgment due to the fact that the class has been decertified and appellate review, at this point, would be either impossible or meaningless. For these reasons, Appellants propose that the trial court's order satisfies the collateral order doctrine. We agree.

¶ 32 Whether the trial court erred in granting partial summary judgment against the absent class members involves an analysis that is severable from and incidental to the underlying merits of Appellants' class claims. Further, the potential res judicata effect on the absent class members' causes of action implicates a right deserving of judicial review, and has irreparable consequences because the members' individual claims could be forever extinguished. Finally, if review of the matter is postponed until final judgment, the absent class members' claim of error will be irreparably lost because the class members are no longer parties to the litigation, and Appellants, stripped of their class representative status, cannot raise appellate issues on their behalf. As such, we conclude that the trial court's order entering partial summary judgment against a decertified class qualifies as a collateral order under Pa.R.A.P. 313(b) and, thus, is reviewable. We therefore proceed to address Appellants' issue on its merits.

¶ 33 In *Green v. Obledo,* 29 Cal.3d 126, 172 Cal.Rptr. 206, 624 P.2d 256, 268–69 (1981), the Supreme Court of California foresaw the adverse effect of delayed decertification on absent class members and observed:

> Without the requirement that class issues be resolved prior to a decision on the merits, a defendant could take advantage of [delayed] decertification. . . . Thus he could appear to acquiesce in the plaintiff's motion to certify the class,

holding back his evidence and arguments on the issue. If the judgment on the merits then goes in his favor, it will bind all members of the class who were notified and bar further lawsuits against him on the same cause of action by all such unnamed class members; indeed, the larger the class, the more he will be insulated from such litigation. Yet if instead he loses on the merits, he can undo most of the damage by bringing out his evidence and arguments and mounting a belated attack on the certification order.

*Id.*

¶ 34 "The application of res judicata principles in class actions is consistent with general principles of res judicata, and the essential inquiry is whether the ultimate and controlling issues have been decided in a prior proceeding in which the parties had an opportunity to appear and assert their rights." 3 Standard Pa. Practice, § 14:120. "A final valid judgment upon the merits by a court of competent jurisdiction bars any future suit between the same parties or their privies on the same cause of action." *Day v. Volkswagenwerk Aktiengesellschaft,* 318 Pa.Super. 225, 464 A.2d 1313, 1317 (1983). Res judicata bars not only the claims that were disposed of via the original judgment, but also those claims that were based upon the same set of facts and could have been asserted in the original proceedings. *Coleman v. Coleman,* 361 Pa.Super. 446, 522 A.2d 1115, 1119 (1987); *see Stuart v. Decision One Mortg. Co., LLC,* 975 A.2d 1151, 1152 (Pa.Super.2009). "The courts of this Commonwealth have long adhered to the generally accepted view disfavoring the splitting of claims." *Coleman,* 522 A.2d at 1120.

¶ 35 In our view, it would be unfair to bind the absent class members to what would effectively be a "final" judgment under the facts and procedure of this case. Here, the trial court ruled against the absent class members on only one of their four claims and then decided to dissolve the entire class, thus terminating the class action litigation and the absent class members' ability to proceed with their cause of action. As a result, the absent class members, having received the requisite notice, are bound by the judgment entered against them even though the trial court ruled that the class action was unsustainable under the law. Were we to uphold the entry of summary judgment, then the absent class members could be forever barred, under the doctrine of res judicata, from later asserting any claims against Defendants in the class members' individual capacities because they already have a judgment entered against them on facts essential to their underlying cause of action—*i.e.,* the details and impact of Defendants' fraudulent marketing scheme. *See* Restatement (Second) of Judgments § 19, *Cmt. g;* § 24(1) (1982) (stating that where summary judgment is entered against a plaintiff, that plaintiff is barred from latter commencing a suit against the same defendant for any legal claims or remedies deriving from "all or any part of the transaction . . . out of which the action arose."). This Court will not endorse such a result. Given the potential res judicata effect on the absent class members' individual causes of action, we conclude that the trial court abused its discretion when it concurrently decertified the class action and ruled on the merits of the absent class members' claim. *Cf. Fireside,* 56 Cal. Rptr.3d 861, 155 P.3d at 278–81 (concluding that the trial court abused its discretion in simultaneously ruling on class certification and a motion for judgment on the pleadings and vacating the judgment entered in favor of the class' claims). Therefore, we vacate the portion of the trial

court's order granting partial summary judgment against the class members on their breach of warranty claim. Our decision to vacate also applies to the stipulation and order insofar as it dismissed the class' UTPCL claim. We now turn to Appellants' final issues on appeal.

¶ 36 Appellants, in their remaining arguments, advance substantive challenges to the trial court's grant of partial summary judgment. For instance, Appellants claim that they adduced sufficient evidence to support their UTPCL and breach of warranty claims and that the trial court entered partial summary judgment in violation of the *Nanty–Glo* rule. *Id.* We conclude that Appellants' issues are rendered moot due to our decision to vacate the trial court's order granting partial sum-

mary judgment in favor of Defendants. Consequently, we decline to address Appellants' remaining arguments.

¶ 37 For the above-stated reasons, we affirm the trial court's order to the extent that it decertifies the class action. We vacate the trial court's order insofar as it grants partial summary judgment against the class and their claims.

¶ 38 Order affirmed in part, vacated in part. Case remanded for further proceedings. Jurisdiction relinquished.